300 F.2d 212
 UNITED STATES RETAIL CREDIT ASSOCIATION, INCORPORATED, a corporation, and its officers, George M. Hyde and William C. Childs, individually and as officers of said corporation, Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 No. 8335.
 United States Court of Appeals Fourth Circuit.
 Argued October 5, 1961.
 Decided February 28, 1962.
 
 Walter E. Gallagher, Washington, D. C. (Gallagher, Connor & Boland, Washington, D. C., and Wayne R. Milburn, Painesville, Ohio, on brief), for petitioners.
 Thomas F. Howder, Atty., F. T. C., Washington, D. C. (James McI. Henderson, Gen. Counsel, Alan B. Hobbes, Asst. Gen. Counsel, and John W. Carter, Jr., Atty., F. T. C., Washington, D. C., on brief), for respondent.
 Before SOBELOFF, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.
 BOREMAN, Circuit Judge.
 
 
 1
 This case is here on petition for review of a cease and desist order issued by the Federal Trade Commission at the conclusion of an administrative proceeding wherein United States Retail Credit Association, Incorporated, hereinafter referred to as "Association, Inc.," William C. Childs and George M. Hyde[1] (the two named persons individually and as officers of said corporation) were found to be violating the Federal Trade Commission Act.[2]
 
 
 2
 In May 1959 the Commission issued its complaint alleging that the accused were engaged in the business of operating, in interstate commerce, a collection agency and "have been in substantial competition" with others engaged in the same business; that through the use of the name of the corporation and the name "United States Retail Credit Association", through reference to subscribers to Association, Inc.'s service as "Members of United States Retail Credit Association", through dissemination to the public of many false, misleading and deceptive statements and representations, more particularly hereinafter described and explained, the accused had falsely represented that Association, Inc., was, and carried on the business of, a retail credit association on behalf of its "members." The accused, while admitting certain acts and practices, denied that the same constituted unfair methods of competition in violation of the Federal Trade Commission Act.
 
 
 3
 Evidence was taken before a hearing examiner who filed his initial decision containing his findings, conclusions and a cease and desist order.[3] On appeal, the Commission set aside the examiner's decision, made its own findings of fact, stated its own conclusions and enlarged the cease and desist order.[4] There were no material conflicts in the evidence and thus the credibility of the witnesses is not involved. The basic facts which will be later set forth are not in dispute.
 
 
 4
 In May 1956, Hyde organized and secured a charter of incorporation for Association, Inc., a stock corporation organized for profit. The corporation's office and principal place of business is located in rented property at 1423 Mentor Avenue, Mentor, Ohio. It appears from the evidence that, prior to the organization of Association, Inc., George M. Hyde operated a collection agency under the name of "Security Credit Acceptance Corporation," of which he was the dominant stockholder. In this operation William C. Childs was "Collection Correspondent" and the business was conducted from a building at 1420 Mentor Avenue, Mentor, Ohio. Before going with Mr. Hyde, Childs worked for another collection agency and before that he was in the poultry business. Insofar as shown by the record, the principal business experience of Hyde and Childs was that of operating a collection agency. All the stock of Association, Inc., is owned by Hyde and his wife. Hyde became president and later Childs became Secretary-Treasurer.
 
 
 5
 The accused are engaged in selling a service to business and professional men. By the terms of a contract entitled "Official Membership Application and Agreement," Association, Inc., furnishes to a subscriber a portfolio called the "Credit Secretary," containing (1) a metal membership emblem, (2) a supply of stickers, (3) a booklet containing "Official Delinquency Notices and Association Forwarding Data," (4) blank forms for listing accounts forwarded under the terms of the contract to Association, Inc., for collection, and (5) a booklet of "Official Goodwill Budget Plan Notes."
 
 
 6
 The metal membership emblem, to be displayed in the subscriber's office or place of business, announces that unpaid accounts are forwarded to the United States Retail Credit Association and advises patrons to "Protect Your Credit Rating — Pay Accounts Promptly When Due." It also bears the legend, "Member of United States Retail Credit Association." The stickers are of red paper and in the shape of a shield. Imprinted thereon in white letters are the words, "Member — Past Due Accounts sent to the United States Retail Credit Association for Collection." These stickers are to be pasted on monthly statements mailed by the subscribers to charge account customers. If the debtor continues in default, the subscriber mails an "Official Delinquency Notice" which advises that unless prompt payment is made the account will be forwarded to the Association for collection. The forms are to assist the subscribers in collecting their own accounts before seeking help from Association, Inc.
 
 
 7
 Each subscriber is entitled to forward to Association, Inc., a specified number of accounts for collection, varying according to the amount of enrollment fee paid. There are eleven different enrollment fees ranging from $40 to $720. A subscriber paying a fee of $40 is entitled to forward to Association, Inc., thirty-five accounts for collection during the year; one paying the maximum fee is entitled to forward seven hundred accounts for collection. No charges are made by Association, Inc., for collecting these accounts until it has collected and remitted to the subscriber an amount equal to the enrollment fee paid; thereafter a fee of 15% is charged on all accounts collected. It is undisputed that Association, Inc., is in substantial competition in interstate commerce with others engaged in the business of collecting delinquent accounts.
 
 
 8
 It was found that the accused feature the full corporate name of Association, Inc., as well as the name, "United States Retail Credit Association," and refer to their subscribers as "Members of United States Retail Credit Association." The Commission found that by this means the accused represent that Association, Inc., is a retail credit association composed of retail credit men banded together for the mutual benefit of the members and for educational and social purposes; that these representations are false, misleading and deceptive; that Association, Inc., is not a retail credit association and is not engaged in carrying on such activities for members; that the accused are engaged, essentially, in the sale of materials for their subscribers' use in collecting their accounts and in furnishing a collection service to those of their "members" who forward delinquent accounts for collection. The accused identify their business as a "nationwide association of business and professional men dedicated to the preservation and maintenance of sound credit practices." The Commission found that the accused thereby represent that their business is an association composed of business and professional men banded together for the compilation, maintenance and dissemination of credit information for members and represent that their organization is nationwide in scope, operation and coverage. Such representation the Commission found to be false, misleading and deceptive since the accused are not an association and do not operate an association of business or professional men of any kind for any purpose. The Commission further found that the accused have made many statements in reference to the nature, extent and size of their business, the length of time in which it has been in operation and the services afforded to subscribers;[5] that Association, Inc., had been in business only about four years; that it does not have professional collectors throughout the United States, all collection activities being conducted from offices in Mentor, Ohio, and limited to contacting delinquent debtors through the mails; that there are no investigations made through banks, employers or others; that the accused did not issue credit reports; that there are no branch offices in various sections of the United States.
 
 
 9
 The Commission reached the conclusion that the use by the accused of these false and misleading statements and representations had the capacity and tendency to mislead the public, including business concerns and debtors, into the mistaken belief that such statements were true, resulting in substantial trade being unfairly diverted to the accused from their competitors.
 
 
 10
 We get the impression that the accused are laboring under the mistaken idea that if the Commission's order be upheld, they will be forced to discontinue their present business. In their brief they state: "Therefore, it is obviously incongruous for this Commission to seek to deprive the Petitioner Association from engaging in a legitimate business * * *." However, we find nothing to indicate that the Commission is here attempting to prevent the accused from continuing to engage in the business of operating a collection agency or service which the Commission finds to be their real and only business. The Commission's primary and basic objective is to require discontinuance of the unlawful use of representations calculated to deceive and create the false impression that their business is other than that in which they are actually engaged.
 
 
 11
 One of the principal points raised on review is that the Commission's findings, insofar as they are in conflict with those of the examiner, are not supported by substantial evidence and should be set aside. The accused urge support and approval of the examiner's findings and conclusions which, in important particulars, are favorable to them. The restrictions imposed by the examiner's initial cease and desist order are much less drastic than those of the Commission.
 
 
 12
 In the presentation of their argument, accused are reluctant to face up to the true and actual nature of their operations. They inform the court that its task is "relatively simple," requiring no more than a "cursory review of the testimony and exhibits in the record." We are asked to consider what may be characterized as their rather superficial factual analysis, replete with meaningless generalities, as evidenced by their liberal use of terms such as "credit," "retail credit," "member" and "association" while choosing to ignore the specific sense in which those terms are used. Doubtless it would be to accused's advantage if the meaning of those words were to be kept vague and undefined. They uniquely characterize the initial decision of the examiner as "the most substantial evidence of record."
 
 
 13
 Accused unduly magnify the weight to be given to an examiner's decision. Such decision is not evidence, substantial or otherwise, in the sense for which accused contend. In Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Supreme Court was concerned with a decision of the Court of Appeals for the Second Circuit (179 F.2d 749) to the effect that a reviewing court cannot take into account the report of the examiner on questions of fact insofar as that report was rejected by the Board. Although the Supreme Court reversed, the opinion made it perfectly clear that slavish deference by the agency to the examiner's decision is not required. At 340 U.S. 474, 496-497, 71 S.Ct. 456, 469, the Court said:
 
 
 14
 "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The `substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is `substantial.'"
 
 
 15
 As we interpret the Universal Camera decision, the reviewing court is not prevented from considering the examiner's decision; if the agency's findings are not supported by substantial evidence, and if the examiner's findings are, the agency's findings must give way to those of the examiner. The examiner's findings are not sacrosanct; there is no mandate that the Commission accept them; they are but one portion of the entire record which the court is to consider in its review.
 
 
 16
 Relying principally upon Universal Camera, accused contend that the examiner who heard the testimony was in a better position to determine "the weight, or lack thereof," to be accorded certain testimony. Among others, three witnesses, one from the Credit Bureau of Cleveland, one from Cleveland Association of Credit Management, and one from the Credit Bureau of Northern Ohio, testified with particularity as to the manner in which their respective organizations were operated and generally as to the operations of other credit associations and organizations. The examiner who heard and observed these witnesses did not question their testimony in any respect. He simply determined that "the circumstance that the functions and method of operations of * * * [Association, Inc.] are unlike those of" the three credit organizations last above named did not thereby change the nature of the business of Association, Inc., and make it the solicitation of delinquent accounts. The examiner further held: "Nor does the circumstance that the principal business of many credit bureaus or associations is the accumulation and dissemination of information concerning the credit worthiness and paying habits of individuals and companies make the name of * * * [Association, Inc.] misleading merely because the principal business of * * * [Association, Inc.] is not identical to that of" those associations. But the Commission likewise gave full force and credit to the testimony of all witnesses; it did not question their credibility in any manner. The Commission simply reached a conclusion different from that of the examiner as to the effect of that testimony in determining the actual business in which Association, Inc., was engaged and whether a part of its corporate name, i. e., "Retail Credit Association," was misleading and deceptive.
 
 
 17
 Certain applicable principles appear to be well settled. The Federal Trade Commission Act, § 5(c), 52 Stat. 112, 15 U.S.C.A. § 45(c) (1958), provides in pertinent part: "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive." On issues of fact, our review of the Commission's order is limited to an inquiry and determination whether there is substantial evidence in the record to support the Commission's decision.[6] The weight to be given to admitted facts and circumstances and the inferences to be drawn therefrom are for the Commission.[7] It is not necessary that witnesses attest to the deceptive nature of the representations; this the Commission may determine for itself through visual inspection and analysis.[8] In analyzing and reviewing the evidence it was proper for the Commission, and it is proper for this court, to take into consideration the pattern and framework of the whole enterprise in which the accused were engaged.[9]
 
 
 18
 The accused primarily attack the Commission's determination that they should discontinue the use of the words "association" and "credit association." They devote much time and space to a discussion of the meaning of the word "association." It was the use of "association" as denoting an organization of members and, further, the use in connection with and when preceded by the word "credit" which was disapproved by the Commission. The entire record of testimony cannot be reproduced but we will note below[10] the pertinent testimony, condensed as much as possible, of certain witnesses.
 
 
 19
 In an effort to avoid the impact of the evidence mentioned in the last footnote, the accused characterized the three organizations whose officers appeared as witnesses as "competitors." There is no basis for that characterization in the allegations of the complaint, the answer thereto or the Commission's findings. The complaint did not charge, nor did the Commission find, that these concerns or any other retail credit bureau or association were competitors of Association, Inc.
 
 
 20
 The attempt by the accused to justify their right to represent Association, Inc., as a "retail credit association" was found to be without factual support. In adjudging the falsity of advertising representations, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which such representations might reasonably be expected to have upon the general public. See P. Lorillard Co. v. Federal Trade Commission, 186 F.2d 52, 58 (4th Cir.1950). The general public, of course, includes the merchants and business men with whom petitioners deal by offering, through their agents and solicitors, a scheme for collecting debts.
 
 
 21
 In answering the original complaint, it was admitted by the accused that: Association, Inc., has "members only in the sense that all clients are referred to as members"; they use this language: "A nationwide association of business and professional men dedicated to the preservation and maintenance of sound credit practices"; they had not made investigations through banks, employers or others; Association, Inc., had not been in the collection or any other business for thirty years; they had not used professional collectors throughout the United States. In formal fashion they denied the charge that they did not issue "credit reports" but before the examiner it was admitted by the witness, Mrs. Anthony, that not one credit report had actually been issued by them to her knowledge. Witness Hyde admitted that no credit reports had been issued to customers. Accused admit that they have been in competition with collection agencies in that their service seeks to eliminate the need for such agencies and to assist businesses in handling their own "retail credit problems."
 
 
 22
 It was undisputed that the customers who purchase the offered service are obtained through solicitors employed on a commission basis who call on business and professional men in various parts of the United States. The metal emblem included in the "Credit Secretary" mailed to subscribers was found to be quite similar to the emblem furnished by the National Retail Credit Association to its members.
 
 
 23
 It was determined by the Commission that the accused "are not and do not operate an association of business or professional men of any kind or for any purpose." The Commission ordered the accused to discontinue the use of the word "association" and the words "credit association." Reference to any dictionary reveals that the word "association" has various meanings and significations. The Commission took the permissible and logical view that, as used in the corporate name of Association, Inc., and in the statements and representations made by the accused, the word "association" was intended by them to mean a body of persons acting together for the promotion of an object of mutual interest or advantage. Taking into consideration the pattern and framework of the whole enterprise in which the accused were engaged, the Commission might and obviously did conclude that the so-called members were not joined together in any way to promote an object of mutual advantage, each subscriber acting as an individual to protect his own interests. In their brief the accused state:
 
 
 24
 "There is not a scintilla of record evidence to refute the contention that the members of this Petitioner Association are a collection of persons joined together for the object of handling their credit accounts expeditiously and inexpensively. In fact, this Association can be aptly described in present day vernacular as a `do it yourself service' embracing as the term connotes savings in outlay of money."
 
 
 25
 Thus, by their own words, the accused appear to admit that the business in which they are engaged in selling to their subscribers a "do it yourself" kit to enable the subscribers to save money simply by collecting their own accounts.
 
 
 26
 It was shown in evidence that when an account was placed by a subscriber with Association, Inc., for collection, a separate file was kept on the particular delinquent debtor; in each file were recorded the results of the collection effort with other information such as debtor's age, the name of his employer, the name of his wife, etc. Mr. Hyde, President of Association, Inc., testified that they stressed the fact that whatever information they had in their files would be made available to their subscribers, admitting, however, that in the great majority of cases the files contained no information other than that of a very general nature as mentioned above. It was uncontradicted that printed matter used by the accused in dealing with prospective customers contained the following: "Free Credit Reports — there will be no charge to member for credit information extracted from association files, nor any limit on number of such credit reports member may request." The examiner found this printed statement to be clear and unambiguous; that "it means just what it says"; that the "type of credit information is clearly stated and corporate respondent's members would understand" that there was to be no charge for information extracted from Association files. But the Commission found that through the use of the statements shown in footnote 5 (except (2) therein), the accused "have represented and now represent, directly and by implication, that they have branch offices in various sections of the United States; that corporate respondent [Association, Inc.] has been in the collection business for thirty years; that respondents [accused] have their own professional collectors throughout the United States; that they make investigations through banks, employers and others; and that they issue credit reports to their clients." (Emphasis supplied.) The Commission found that such statements and representations are false and misleading; that accused do not make investigations through banks, employers and others, nor do they issue credit reports. There was testimony in the record to indicate the meaning of the phrase "credit reports" as generally understood by and among those familiar with the business of credit reporting, i. e., that the purpose of a credit report is to furnish informative data by which the integrity, financial responsibility and credit risk of individuals and others can be determined. Obviously, the Commission's finding that the accused's statements and representations concerning credit reports were false and misleading was based upon the general understanding of such statements among those having knowledge of the usual and ordinary practices of retail credit associations. The Commission found that accused had never furnished to anyone, customer or otherwise, a credit report. It was clear from the evidence that they possessed neither the information nor the facilities for gathering such information necessary to such credit reporting. Accused's representations as to "credit reports," whether "free" or otherwise, were apparently made for the purpose of gaining for Association, Inc.'s activity the recognition and respect usually accorded to well-known national credit reporting associations, to the consequent deception of the public. We conclude that the Commission's findings in these particulars are supported by substantial evidence.
 
 
 27
 The Commission found that accused represented, through use of the phrase, "National Headquarters — U.S.R. C.A. Building, Mentor, Ohio," that they have branch offices in various sections of the United States. It was an admitted fact that the sole office of Association, Inc., was in Mentor, Ohio. The word "national," used to designate the headquarters of a business concern, carries the natural implication that the business conducted is national in scope. The finding of the Commission as to the representation concerning branch offices may reasonably be based upon the permissible inference drawn from the words "National Headquarters." An inference made by an administrative agency may not be set aside upon judicial review because the court would have drawn a different inference. National Labor Relations Board v. Southern Bell Telephone Co., 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250 (1943).
 
 
 28
 Accused complain that no witness testified that the allegedly deceptive language actually deceived anyone or had a capacity to deceive. The Commission found that the use by accused of the false and misleading statements and representations has the capacity and tendency "to deceive and mislead members of the public, including business concerns and debtors, into the erroneous and mistaken beliefs that said statements and representations are true. As a result thereof, substantial trade has been, and is being, unfairly diverted to respondents from their competitors." It is in the public interest generally to prevent the use of false and misleading statements in the conduct of business operations. To support an order to cease and desist, an actual deception need not be shown; a finding of a tendency and capacity to deceive and mislead will suffice. Charles of the Ritz Dist. Corp. v. Federal Trade Commission, 143 F.2d 676, 680, and cases there cited (2d Cir. 1944). See also Fioret Sales Co. v. Federal Trade Commission, 100 F.2d 358, 359 (2d Cir.1938).
 
 
 29
 We conclude that the Commission's findings of fact, inferences and conclusions here attacked are substantially supported by the record and that the Commission's order to cease and desist is warranted. An appropriate order of compliance will issue pursuant to the Federal Trade Commission Act, Sec. 5(c), 52 Stat. 113, 15 U.S.C.A. § 45(c), (1958).
 
 
 30
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Federal Trade Commission, to be referred to as "the Commission," dismissed from the proceeding original parties Edward W. Elliott and Margaret W. Anthony. The petitioners here, who were respondents before the Commission, are Association, Inc., Childs and Hyde. They will sometimes be referred to collectively as "the accused," or "accused."
 
 
 [2]
 The pertinent provisions of the Act are —
 Section 5(a) (1), 66 Stat. 632, 15 U.S. C.A. § 45(a) (1):
 "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful."
 Section 5(a) (6), 66 Stat. 632, 15 U.S. C.A. § 45(a) (6):
 "The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."
 
 
 [3]
 The initial order of the hearing examiner directed that the accused should forthwith cease and desist from directly or indirectly representing:
 
 
 [1]
 That any of the accused have been in any kind of business in excess of the actual time so engaged;
 
 
 [2]
 That they have professional collectors throughout the United States;
 
 
 [3]
 That they make investigations through banks, employers and others, or that any effort at investigating exceed routine inquiries by correspondence;
 
 
 [4]
 That the service rendered "reaches into states not actually reached."
 
 
 [4]
 Based upon its own findings of fact and conclusions, the Commission ordered Association, Inc., Childs and Hyde, individually and as corporate officers, their agents, representatives and employees, to cease and desist from:
 
 
 [1]
 Using the words "Association" or "Credit Association," or any other term of similar import or meaning in the corporate name of Association, Inc., or in any other manner designating, describing or referring to the respondents' business or otherwise representing, directly or by implication, that respondents' business is an association or a credit reporting agency
 
 
 [2]
 Representing, directly or by implication, that respondents have branch offices
 
 
 [3]
 Representing, directly or by implication, that any of the respondents have been in any kind of business in excess of the actual time in which such respondent or respondents have been so engaged
 
 
 [4]
 Representing, directly or by implication, that respondents have professional collectors throughout the United States or at any place where they do not have such representatives
 
 
 [5]
 Representing, directly or by implication, that respondents make investigations through banks, employers or others or that their efforts at investigating, when made, exceed that of routine inquiries by correspondence
 
 
 [6]
 Representing, directly or by implication, that the service rendered by respondents reaches into states of the United States or any area not actually reached
 
 
 [7]
 Representing, directly or by implication, that respondents furnish credit reports or that their files contain any credit information other than that relating to debtors whose accounts have been submitted to respondents for collection
 
 
 [5]
 Typical of statements and representations were the following: (1) National Headquarters USRCA Building, Mentor, Ohio; (2) a nationwide association of business and professional men dedicated to the preservation and maintenance of sound credit practices; (3) backed by the power of thirty years' progress; (4) professional collectors throughout the United States; (5) investigations made through banks, employers, etc.; (6) service reaches into every state, county, city and village in the entire United States of America; (7) Free Credit Reports. There will be no charge to members for credit information extracted from association files nor any limit on number of such credit reports member may request
 
 
 [6]
 Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [7]
 Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945); Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534 (1927)
 
 
 [8]
 E. F. Drew & Co. v. Federal Trade Commission, 235 F.2d 735 (2d Cir. 1956), certiorari denied, 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.2d 323 (1957); Zenith Radio Corp. v. Federal Trade Commission, 143 F.2d 29 (7th Cir. 1944)
 
 
 [9]
 See Goodman v. Federal Trade Commission, 244 F.2d 584 (9th Cir. 1957)
 
 
 [10]
 Gordon W. Gray, Secretary and General Manager of Credit Bureau of Cleveland, had been employed by that organization for approximately twenty-eight years. He testified that the credit bureau was owned by its members, principally merchants, utilities, newspapers and banks, consisted of approximately four thousand members, was a central depository of credit information and that its files reflected the paying habits of approximately three and one-half million people. In response to the question, "Do you know what the functions of a credit bureau are?", the witness replied, "Well, based upon my experience, I would say that a credit bureau is an organization of members and subscribers whose staff is engaged primarily in the gathering and recording and dissemination of information for those members relative to the credit worth and financial responsibility, paying habit, character of individuals who are being considered for credit extension, in order — these functions being performed so that a credit-granting member may be able to make a sound decision in his extension of credit. Now, that is the primary purpose. A credit bureau may or may not operate a collection department for the benefit of their members." He testified that his organizationdid operate a collection department. When Mr. Gray was asked, "And what does the word `association' mean to you, if anything?", he stated, "Well, at first blush I would consider it an association for educational and social purposes for the benefit of those in the trade such as, well, National Retail Credit Association, credit managers and so on, or American Bar Association, or the medical association. That is my first [reaction] to the use of the word `association'." This witness was asked if the words "retail credit association" had any significance to him and he replied: "Well, in this way they would, in the first place I would think of it as either a national or a city type of an association, as I mentioned, but it is possible and I believe in some few cities that exists that a credit bureau is known as a retail credit association, a credit bureau, as defined by me a moment ago. I might add that that practice has been fading away for twenty some years, and most operations [of] that type are now known as credit bureaus."
 Ralph H. Coleman, Secretary of the Cleveland Association of Credit Management, testified that his employer is a membership, nonprofit organization, set up for the purpose of facilitating the exchange of credit information among its members; that it consists of approximately 675 members in the northern part of Ohio and is affiliated with the National Association of Credit Men. Mr. Coleman was asked, "Do the words `retail credit association' mean anything to you or would they have any significance to you?", and he replied, "Well, they do. In the way they're normally spoken of in my contracts with the public, retail credit association usually means a local organization of business men formed to serve their credit in the retail field." When asked, "Now, if you saw the name `United States Retail Credit Association' would it have any significance or meaning to you?", he replied, "Well, it would strike me immediately that it is a national organization of retail credit men."
 Harold E. Powell, President of the Credit Bureau of Northern Ohio, stated that the memberships in his organization were from all strata of retail credit, including banks, finance companies, mortgage loan companies, the Federal Housing Administration and the Veterans' Administration; that the business of his organization was "primarily a credit reporting agency" and that it also had a collection service division; that the credit reporting function of his agency was "[m]aking both oral and written reports to subscribers, members and other credit bureaus throughout the United States on the credit responsibility, net worth and credit worthiness of individuals"; that his organization furnished such information to all of the major oil companies for credit cards, to the American Express Company for its national credit cards, and to the Hilton Hotels for their credit cards; that the facilities and services of his agency were used by the Federal Bureau of Investigation, Civil Service Commission, the Departments of the Army and the Navy; that his organization was a member of the Associated Credit Bureaus of America, the Associated Credit Bureau of Ohio, the National Retail Credit Association and Credit Bureau Reports, Inc., of New York. When Mr. Powell was asked what meaning the words "retail credit association" conveyed to him, he stated, "Being members of the National Retail Credit Association, it infers that it is an association of individuals in the credit field for the mutual benefit of each," and he said that the words "United States Retail Credit Association" meant to the general public that "it was a national retail credit association." He further stated: "The functions of the National Retail Credit Association are to promote the sound expansion of credit, retail credit, in the United States, to educate credit men and credit women in ethical practices, to educate employees of the firms holding the membership in the wide use of credit and to promote sound credit thinking on the part of the general public."
 Margaret W. Anthony, formerly Secretary-Treasurer of Association, Inc., testified in part as follows: "Q. What was the nature of the business of the United States Retail Credit Association? A. Well, it was a credit management program. Q. Did it have anything to do with the collection of accounts of the customers? A. Yes; we handled collections. Q. Would you state what the credit management program was that you say that it was engaged in? A. Well, it was really a program to furnish the necessary supplies so that the members could handle their own collections without cost." This witness testified further that she had been employed by collection agencies and, from her experience, the effort devoted by Association, Inc., in attempts to effect collections of accounts was standard procedure.
 William Childs, at the time of the hearing and for several months prior thereto, was Secretary-Treasurer and "Director of Sales" of Association, Inc. He testified: "Primarily, we have a business service where we supply these members with the red shields, the placque, the delinquency notices, and notes and then we attempt to instruct or teach the creditor how to use these so he can collect his own accounts free of charge."