**SEARS, ROEBUCK AND CO., a corporation, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 80–7368.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1981.

Decided May 6, 1982.

As Amended on Denial of Rehearing and Rehearing En Banc June 22, 1982.

Francis R. Kirkham, Richard J. MacLaury, George A. Sears, San Francisco, Cal., for petitioner.

Ernest Isenstadt, F. T. C., Washington, D. C., for respondent.

Before DUNIWAY, ANDERSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Petitioner Sears, Roebuck and Co. is the largest retailer of general merchandise in the United States. As such, it is also one of the country's largest advertisers. This case presents a number of questions relating to the validity of a multi-product order issued by the Federal Trade Commission (the Commission) as the result of Sears' use of certain unfair and deceptive advertising practices to sell one of the products in the product group. We enforce the order.

I

THE ADVERTISEMENTS AND THE
COMMISSION PROCEEDINGS

The material facts are undisputed. In the early 1970's Sears formulated a plan to increase sales of its top of the line "Lady Kenmore" brand dishwasher. The plan did not call for reengineering of the dishwasher

or any mechanical improvement. Rather, it contemplated changing the image of the Lady Kenmore, or, in the jargon, it sought a "repositioning" of the machine. The objective was to:

transform the consumer image [of the Lady Kenmore] from a "price" brand to a superior product at a reasonable price. Eventually, the brand should move from market leadership to market dominance as the market share increases.[1]

To achieve this objective, the company needed a sales strategy. Like any good merchant, Sears knew its market. It knew that a machine that would actually perform the entire job of washing dishes and would eliminate the need for people to pre-rinse and pre-scrape their dishes would attract new customers and command a premium price.[2] It also knew that a machine's ability to clean dishes on the upper rack as thoroughly as those on the bottom rack would be an effective inducement to the consumer.

Acting on this knowledge, Sears prepared advertisements claiming that the Lady Kenmore "completely eliminated" the need for pre-scraping and pre-rinsing, and characterized the machine as the "Freedom Maker." Advertisements stated, *inter alia*:

SEARS LADY KENMORE. THE DO–IT–ITSELF DISHWASHER. No scraping. No pre-rinsing. Lady Kenmore has 6 powerful hot water jets for the bottom rack, surging hot water with enough force to scrub every dish, pot and pan *really* clean. Even baked-on food comes off. And the dishes on top get as clean as those on the bottom.

\* \* \* \* \* \*

... With a Kenmore you'll never have to scrape or rinse again. Even dishes crusty with leftover food. Kenmore's 14 powerful hot water jets scour every dish clean ... with no scraping or rinsing.

\* \* \* \* \* \*

It's great! You'll like the way it makes pre-rinsing and soaking of heavily soiled dishes, pots and pans a thing of the past.

\* \* \* \* \* \*

Gets even the messiest baking dishes and roasting pans spotlessly clean ... without pre-rinsing!

\* \* \* \* \* \*

Wouldn't the woman in your life love a Kenmore Dishwasher for Mother's Day. A Kenmore dishwasher from Sears means no more dishpan hands, she'll never have to touch dishwater again! Egg, lipstick, peanut butter, jelly, even spaghetti sauce come right off with no pre-rinsing.[3]

Rendered in various forms, these themes appeared in print and electronic advertisements throughout the country over a four year period at a cost to Sears of roughly $8 million. During the first three years of the promotion (1971–1973), Lady Kenmore unit sales rose 300%, from 35,029 units in 1971 to 105,570 units in 1973. These figures represent the Lady Kenmore's rise from only 10% of total Sears dishwasher sales in 1971 to 23% of total Sears' dishwasher sales in 1973. The value of the company's total dishwasher sales rose from $73,470,000 in 1971 to $94,500,000 in 1973.[4]

Unfortunately, the "no scraping, no pre-rinsing" claim was not true. Sears had no

1. *Sears, Roebuck and Co.*, 95 F.T.C. 406, 512 (1980), *quoting* a document prepared by Sears' advertising agency.

2. The Commission describes this as a "common sense" proposition. This is so because dishwashers do not wash dishes completely. Rather, the machines rinse, remove trace elements of dirt from, and dry dishes that have been pre-rinsed and scraped by the person or persons in the home who are willing to undertake, or are assigned, that task. Thus the washing of dishes is accomplished in part by a person and in part by the machine. The advantage to consumers of a machine which would eliminate the need to pre-rinse and pre-scrape is therefore obvious.

3. The record does not reflect whether a comparable advertisement appeared on Father's Day.

4. At petitioner's suggestion, we do not decide that these advertisements alone caused the sales increase. However, we reject the notion that a 3% increase in national market share (from 26% to 29%) including, *inter alia*, a 300% increase in Lady Kenmore sales is not the "dramatic rise" in sales which the Commission alleges.

reasonable basis for asserting the claim, and the instructions in the Owner's Manual which customers received *after* they purchased the dishwasher contradicted the claim. In addition, a 1973 survey conducted for Sears showed that more than half of recent Lady Kenmore purchasers either disagreed, or would not "completely agree" with the proposition that the Lady Kenmore "does not require pre-rinsing".

The Commission began an investigation of the advertisements in July of 1975. A complaint issued on November 20, 1977, charging petitioner and its advertising agency, J. Walter Thompson Co.,[5] with disseminating deceptive and unfair advertisements in violation of section 5 of the Federal Trade Commission Act (The Act), codified in part at 15 U.S.C. § 45(a)(1) (1976). The complaint identified Sears' dishwasher claims as:

(1) the Lady Kenmore dishwasher will completely remove, without prior rinsing or scraping, all residue and film from dishes, pots and pans used in cooking and baking according to normal consumer recipes and under other circumstances normally and expectably encountered by consumers;

(2) dishes in the top rack of the Lady Kenmore dishwashers will get as clean as those in the bottom rack without prior rinsing or scraping;

(3) the Lady Kenmore "Sani-Wash" cycle, by giving dishes an "extra hot 155 degree final rinse," destroyed all harmful and other bacteria and microorganisms on the dishes and pots and pans.

The complaint averred:

(1) that Sears lacked a reasonable basis for the three advertised claims;

(2) that claims (1) and (3) were false;

(3) that advertising demonstrations purporting to prove claim (1) were false and deceptive; and

(4) that the Owner's Manual instructions provided with each dishwasher contradicted claim (1), and were material and that claim (1) was deceptive and unfair since the advertising did not reveal the instructions.[6]

After extensive administrative proceedings, the administrative law judge (ALJ) made elaborate findings of fact and held Sears liable on all charges in the complaint. He entered a proposed order. The company appealed.

Before the Commission, Sears challenged a single element of the liability finding—the "Sani-Wash" issue—and several aspects of the remedial order. It did not dispute the ALJ's findings (1) that the no pre-rinsing or scraping claim was false and unsubstantiated; (2) that the "upper rack gets as clean as those on the bottom rack" claim was unsubstantiated; (3) that demonstrations purporting to prove these cleaning claims were false; (4) that its own tests showed a need for pre-scraping and rinsing and that its surveys showed that consumers found it necessary to pre-scrape and rinse; and (5) that the Owner's Manual provided with each dishwasher contradicted the advertisements. Nor did Sears contest the order's provisions covering these findings. It did quarrel with (1) the liability finding on the "Sani-Wash" issue, (2) the prior substantiation element of the recommended order, (3) the order's coverage of products other than dishwashers, including the proscription against false and unsubstantiated performance claims, and (4) language in the record keeping section of the order.

**5.** Prior to the administrative proceeding, the advertising agency, J. Walter Thompson Co., signed a consent decree and is therefore not a party to this litigation.

**6.** Sears answered on January 19, 1978. It denied most of the substantive allegations and raised four affirmative defenses:
  1. that it had abandoned the challenged practices;
  2. that the challenged practices were industry-wide;
  3. that the challenged advertisements were insignificant; and
  4. that the ads did not require prior substantiation because they caused no material adverse effect upon consumer health or safety.
  Contention 1 has been firmly rejected as a defense by those courts considering it. *See Fedders Corp. v. FTC*, 529 F.2d 1398, 1403 (2d Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976) (collecting cases).

The Commission issued its opinion and final order on April 28, 1980. It vacated liability as to misrepresentation of the Lady Kenmore's sanitizing qualities.[7] On the remedy issues, it narrowed the definition of the order's term "major home appliances," [8] and deleted a phrase in the record keeping section.[9] On the other remedy issues: prior substantiation, product coverage, and the remaining record keeping questions, it affirmed unanimously.

The final order requires Sears to cease and desist from making the "no pre-rinsing or scraping" and "top rack as clean as the bottom rack" claims. It also prevents Sears from (1) making any "performance claims" for "major home appliances" without first possessing a reasonable basis consisting of "[c]ompetent and reliable tests" or other evidence that substantiates such claims; (2) misrepresenting any test, survey or demonstration regarding "major home appliances" and (3) making any advertising statements not consistent with statements in post-purchase materials supplied to purchasers of "major home appliances." The record keeping section requires Sears to maintain certain written records for a period of three years after the last dissemination of any actual advertisements.[10]

We think it appropriate here to clarify the arguments that Sears does *not* make on this appeal. First, it does not challenge any

---

7. Accordingly, there is no issue relating to liability before us. We are concerned solely with issues relating to remedy.

8. The Commission removed the phrase "and any other product that falls into the category of major home appliances" from the definition of major home appliances thereby limiting the term to 14 particular products. *See* n.25 for the revised definition. As we conclude in Section II, subsection C, *infra*, the Commission properly characterized these 14 products as "major home appliances."

9. It amended the phrase "all matter in [Sears] possession" to include only retention of applicable "test reports, studies, surveys or demonstrations . . . ."

10. The final order, *Sears, Roebuck and Co.*, 95 F.T.C. at 524–27, provides *inter alia*:

I.

*It Is Ordered*, That for purposes of this order the following definitions shall apply:
1. "Major home appliance" means air conditioning units (room or built-in), clothes washers, clothes dryers, disposers, dishwashers, trash compactors, refrigerators, refrigerator/freezers, ranges, stoves, ovens (including microwave ovens), humidifiers, and dehumidifiers.
2. "Competent and reliable test" means a test in which persons with skill and expert knowledge in the field to which the test pertains conduct the test and evaluate its results in an objective manner, using test procedures that insure accurate and reliable results. Such tests must be truly and fully representative of expectable consumer usage.

II.

*It Is Further Ordered*, That Sears, Roebuck and Co., a corporation, its successors and assigns, in connection with the advertising, offering for sale, sale or distribution of dishwashers, in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from:
1. Representing, directly or by implication, that any Sears dishwasher will completely remove, without prior rinsing or scraping, all residue and film from all dishes, and from pots and pans used in cooking and baking according to normal consumer recipes and under other circumstances normally and expectably encountered by consumers.
2. Representing, directly or by implication, that dishes in the top rack of any Sears dishwasher will get as clean as those on the bottom rack without prior rinsing or scraping.
It shall be an affirmative defense to a compliance action brought under the preceding paragraphs for Sears, Roebuck and Co. to establish that the representation is truthful.

III.

*It Is Further Ordered*, That Sears, Roebuck and Co., . . . in connection with the advertising, offering for sale, or sale or distribution of "major home appliances," in or affecting commerce . . . do forthwith cease and desist from:
1. Making any statements or representations, directly or by implication, concerning the performance of such products unless such statements or representations are true and unless, at the time the statements or representations are made, Sears, Roebuck and Co. possesses and relies on a reasonable basis for such statements or representations, which shall consist of competent and reliable tests, or other competent and reliable evidence which substantiates such statements or representations.
2. Misrepresenting in connection with the advertisement of any such products or in any other manner, directly or by implication, the

part of the order as it applies to dishwashers. It therefore accepts the prior reasonable substantiation and performance claim concepts insofar as they relate to dishwashers. Second, it does not attack the order's coverage of products other than dishwashers on any ground not set out in this opinion. For example, it does not question subparagraphs (2) & (3) of paragraph III of the order except insofar as it attacks the rationality or overbreadth of the entire paragraph and except insofar as it complains of subparagraph (2)'s uncertainty. Third, it does not challenge the proscription of false and unsubstantiated "performance claims" as unreasonable *per se*, but objects only to the inclusion of such a proscription in the multiproduct order before us.

Among the facts found by the administrative law judge and affirmed by the Commission, we attach particular importance to the following:

1. that the no scraping, no pre-rinse claim was not true when first made and remained untrue until discontinued four years later;[11]

2. that Sears lacked a reasonable basis for that claim at any time during the four year promotion;

purpose, content or conclusion of any test, experiment, demonstration, study, survey, report, or research.
3. Making any statements or representations, directly or by implication, in connection with the advertisement of any such products which are inconsistent in any material respect with any statements or representations contained directly or by implication in post purchase material(s) supplied to the purchasers of such products.
IV.
*It Is Further Ordered*, That Sears, Roebuck and Co., . . . in connection with the advertising, offering for sale, sale or distribution of dishwashers or other "major home appliances," in or affecting commerce... shall maintain written records:
1. Of all materials that were relied upon in making any claim or representation in advertising, sales materials, promotional materials, or post purchase materials, concerning the performance characteristics of any of Sears, Roebuck and Co.'s dishwashers or other major home appliances;

3. that the tests relied on by Sears indicated the falsity of the no scraping, 'no pre-rinse claim;

4. that the Owner's Manual provided by Sears with each machine explicitly advised purchasers to pre-soak or "lightly" scour certain dishes thereby directly contradicting the advertisements; and

5. that the advertising campaign here was national in scope, was conducted over a period of at least four years, and carried a price tag of $8 million.

## II

### STATUTORY POWER AND THE RATIONALITY OF THE REMEDY

#### 1. *Statutory Power*

■ Sears argues first that the language and legislative history of section 5(b) of the Act, 15 U.S.C. § 45(b), require the Commission to direct its cease and desist orders only to those specific violations alleged in the complaint since only those violations have been litigated in the manner contemplated by the statute.[12] From this doctrine, Sears seems to reason that since the complaint here describes dishwasher advertising, the Commission lacks the power to

2. Of all test reports, studies, surveys, or demonstrations in their possession that contradict, qualify, or call into question any claim or representation in advertising, sales materials, promotional materials, or post purchase materials disseminated by Sears, Roebuck and Co., or by any advertising agency on behalf of . . . Sears, Roebuck and Co.'s dishwashers or other major home appliances. Such records shall be retained by Sears, Roebuck and Co. for a period of three years from the date such advertising, sales materials, promotional materials, or post purchase materials were last disseminated. . . .

11. Although the truth of the "top rack gets as clean as the bottom rack" claim was not decided below, test results submitted by Sears showed that, contrary to the advertisement, the bottom rack "got cleaner" than the top rack.

12. The outline of Commission procedures is codified at 15 U.S.C. § 45(b).

issue an order covering any product except dishwashers. Sears' conclusion is that to the extent that the order covers products other than dishwashers, it is invalid as a matter of law. We disagree.

It is too late to argue that when the Commission establishes a violation only as to one product, its power under the Act is limited to the issuance of a single product order. As the Second Circuit said in *ITT Continental Baking Co. v. FTC*, 532 F.2d 207, 223 (2d Cir. 1976), "[C]ourts have often upheld FTC orders encompassing all products or all products in a broad category, based on violations involving only a single product or group of products . . . ." (Citations omitted). The Supreme Court rendered this doctrine metaphorically in *FTC v. National Lead Co.*, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957). There, the Court reminded the companies that objected, *inter alia*, to the breadth of the Commission's order that "those caught violating the Act must expect some *fencing in*." *Id.* at 431, 77 S.Ct. at 508. (Citation omitted) (emphasis added). Allowance of this "fencing in" authority is based in part on our deference to the FTC's accumulated expertise in striking the proper relationship between violations found and effective orders, *Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1145 (9th Cir. 1978), and in part on necessity since "there is no limit to human inventiveness in this field." H.R.Conf.Rep.No.1142, 63d Cong., 2d Sess., 19 (1914), *quoted in FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240, 92 S.Ct. 898, 903, 31 L.Ed.2d 170 (1972).

Accordingly, we reject Sears' argument here.

### 2. *Rationality of the Remedy*

Sears' next argument can be separated into three elements. First, the company says there is no reasonable relationship between the multi-product portion of the order and the violation found; second, that a multi-product order covering "performance claims" is unreasonably broad; and third, that this order must be limited to dishwashers because the ALJ excluded evidence regarding petitioner's advertising of other major home appliances.

### A. *The First Two Elements: The Specific Violation, Performance Claims, and the Multi-Product Order*

The general principles governing objections to FTC orders are well known.

The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.

*Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612–13, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946).

In addition,

Congress has placed the primary responsibility for fashioning orders on the Commission. *Federal Trade Comm'n v. National Lead Co.*, 352 U.S. 419, 429 [77 S.Ct. 502, 509, 1 L.Ed.2d 438]. For these reasons the courts should not "lightly modify" the Commission's orders. *Federal Trade Comm'n. v. Cement Institute*, 333 U.S. 683, 726 [68 S.Ct. 793, 815, 92 L.Ed. 1010]. However, this Court has also warned that an order's prohibitions "should be clear and precise in order that they may be understood by those against whom they are directed," *Federal Trade Comm'n. v. Cement Institute, supra*, at 726 [68 S.Ct. at 815] . . . .

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 392, 85 S.Ct. 1035, 1046, 13 L.Ed.2d 904 (1965).

A judgment regarding "reasonable relation" in multi-product order cases "depends upon the specific circumstances of the case." *Id.* at 394, 85 S.Ct. at 1047. "[T]he ultimate question is the likelihood of the petitioner committing the sort of unfair practices [the order] prohibit[s]," *Litton Industries, Inc. v. FTC*, 676 F.2d 364 (9th Cir. 1982). We answer that question by first examining the specific circumstances present in a particular case. Then, giving due deference to the Commission's expertise

and judgment, we determine whether there is a "reasonable relation" between those circumstances and the concern regarding future violations manifested by the Commission's order.

■ Where a fair assessment of an advertiser's conduct shows a ready willingness to flout the law, sufficient cause for concern regarding further, additional violations exists. Two factors or elements frequently influence our decision—the deliberateness and seriousness of the present violation, and the violator's past record with respect to unfair advertising practices. *Standard Oil Co. of California v. FTC,* 577 F.2d 653, 662 (9th Cir. 1978).[13] Other circumstances may be weighed, including the adaptability or transferability of the unfair practice to other products. *See Colgate-Palmolive Co.,* 380 U.S. at 395, 85 S.Ct. at 1047. The weight given a particular factor or element will vary. The more egregious the facts with respect to a particular element, the less important it is that another negative factor be present. In the final analysis, we look to the circumstances as a whole and not to the presence or absence of any single factor. *See Porter & Dietsch, Inc. v. FTC,* 605 F.2d 294, 304–05 (7th Cir. 1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); *Jay Norris, Inc. v. FTC,* 598 F.2d 1244, 1250 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979).

For its first point—the impropriety of a multi-product order based on this violation—Sears relies primarily on *American Home Products Corp. v. FTC,* 402 F.2d 232 (6th Cir. 1968). There, reviewing a proceeding relating to the effects of a single ointment, the court struck as unreasonable that part of an order which prevented the company from misrepresenting the "efficacy" of "any drug." *Id.* at 237. The case is not persuasive authority here for two reasons. First, the "major home appliances" category, as defined in the order before us, is far more limited and precise than the "any drug" category. Second, the *Home Products* court's rationale was simply that since the violation involved only one ointment and "no other drug was involved," a multi-product order was unreasonable. *Id.* Since *Home Products,* however, courts have regularly refused to follow such reasoning and have approved multi-product orders despite the fact that those violations found involved only a single product. *See, e.g., ITT Continental Baking Co. v. FTC,* 532 F.2d at 223 (collecting cases).[14]

■ In addition, Sears states that advertisements concerning the other covered products, *e.g.,* microwave ovens and trash compactors, are *never* related to those promoting dishwashers since dishwashers do not perform work similar to the work performed by microwave ovens or trash compactors, and that, therefore, an order covering these functionally unrelated machines is inherently unreasonable. This argument misses the fundamental point that the Commission is concerned not with how machines work, but with how machines are sold. Thus, the correct question is not whether the machines function in similar ways but whether the machines could be sold with similar techniques. We address that question *post* at 394–395.

For its second contention in this section of the argument—that a multi-product order containing a "performance claim" provision is unreasonably broad—Sears relies primarily on *Fedders Corp. v. FTC,* 529 F.2d

---

**13.** The *Standard Oil* court distilled these factors from *FTC v. National Lead Co.,* 352 U.S. at 429–30, 77 S.Ct. at 509.

**14.** The *Home Products* court also found that the order's effect there was "to admonish petitioner not to violate the law again," and was therefore improper. *Id.* at 237. An order which had the effect ascribed by the *Home Products* court to the order before it would be overbroad. *See e.g., Standard Oil Co. of Cali-* fornia v. FTC, 577 F.2d at 661; *see generally, FTC v. Henry Broch & Co.,* 368 U.S. 360, 367–68, 82 S.Ct. 431, 435–36, 7 L.Ed.2d 353 (1962); *FTC v. Ruberoid Co.,* 343 U.S. 470, 487, 72 S.Ct. 800, 810, 96 L.Ed. 1081 (1953) (Jackson, J., dissenting). We need not comment on whether we would have characterized the *Home Products* order in the same way the court there did; we need only say that the order before us does not have that effect.

1398 (2d Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). While *Fedders* did not involve a multi-product order, it did involve an *implied* performance claim. The company advertised its air conditioners as "unique" because of an alleged "reserve cooling power." The Commission found that the "reserve cooling power" claim constituted implicit misrepresentation. The company did not dispute its liability for the misrepresentation, or the provisions of the order covering "uniqueness" claims. The question it brought before the Second Circuit was whether the Commission's order could cover claims for "performance characteristics" of air conditioners when the only claims found false below had been "uniqueness" claims. Basically, the argument was that a "performance" claim was not sufficiently "like and related" to a uniqueness claim to come within the Commission's *Mandel Brothers* authority. *See FTC v. Mandel Brothers*, 359 U.S. 385, 392–93, 79 S.Ct. 818, 824, 3 L.Ed.2d 893 (1959).

Rejecting this argument, and affirming the Commission's order, the court not only held that the "uniqueness" claim was like and related to a performance claim, but that such a claim was a "performance claim by implication" since it "implicated the basic performance characteristics of the entire product." *Fedders*, 529 F.2d at 1403. The court then upheld the Commission's order and expressed approval of the fact that the Commission had limited the ALJ's proscription of unsubstantiated performance claims.[15] Sears asserts that under *Fedders* a more limited proscription of performance claims is required here.

A look at "the specific circumstances" in *Fedders* and in this case demonstrates two basic differences which bear significantly upon the appropriateness of the remedy.

First, there is a difference between a relative performance claim, *e.g.*, the "uniqueness" claim of "ours is better than any other"—and an absolute performance claim, —"*e.g.*, dishes do not need to be pre-rinsed or scraped." Unlike the advertising in the case before us, the emphasis and thrust of the *Fedders* advertising involved a matter of degree. The manufacturer there claimed that its machines cooled the air under more adverse climatic conditions than machines manufactured by others. Second, there is a difference between an implied performance claim and an express one. In *Fedders* the court labeled the claim "a vague design claim" and an "implicit misrepresentation." *Id.* at 1403. Here the claim is clear, direct, unqualified, and explicit. The more clear and direct the statement, the more likely it is to bring about the intended result, and the larger the number of consumers likely to be misled. The violation in the case before us is far more serious in every respect than was the *Fedders* offense.[16]

A more pertinent case is *Jay Norris, Inc. v. FTC*, 598 F.2d 1244 (2d Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979), where the Commission's order required prior substantiation of safety *and* performance claims of *all* of the mail order company's products, requirements far broader than those contested here or in *Fedders*. Approving the reasonableness of the *Jay Norris* order, Judge Oakes, the *Fedders* author, reasoned that it covered "*only* safety and performance" representations, *id.* at 1250 (emphasis added), which the record showed were product characteristics which the Norris company was "wont to exaggerate." *Id.* Rejecting Norris' breadth and vagueness challenges, the court relied on the Commission's "like and related" *Mandel Brothers* authority and the ex-

---

**15.** The FTC limited the order to performance characteristics relating to " 'cooling, dehumidification, or circulation characteristics, capacity or capability . . . .' " *Id.* at 1403, *quoting from* the Commission's opinion.

**16.** We do not suggest that there is a clear-cut line between relative and absolute or implied and express performance claims nor any rigid rules applicable to those various categories of performance claims. Certain relative claims may contain absolute phrases. For example, the Fedders Company justified its "uniqueness" claim by the absolute claim of "reserve cooling power." These distinctions are merely suggestive of considerations which may, along with a number of others, affect the reasonableness of the remedy in particular cases.

tent and substantial nature of the misrepresentations. On those bases, the court upheld an order prohibiting false and unsubstantiated performance claims covering *all* products. Thus the thrust of Second Circuit law on this issue is against Sears' position.

▮ Sears dismisses *Jay Norris* as a case applicable only to companies operating " 'on the fringe of business racketeering.' " We do not agree. We think its rationale applies to a broader range of cases in which extensive and substantial violations of the law are found, not just to cases involving near racketeers. Extensive and substantial violations justifying a multi-product order may include a nationwide, long-term, multi-million dollar false advertising campaign relating to a single widely used, high-cost product as well as the false advertising of a variety of smaller items on a number of separate occasions. Seventh Circuit law also emphasizes the element of the extent and substantiality of the misrepresentation. *Porter & Dietsch, Inc. v. FTC*, 605 F.2d at 304–05.

▮ We now consider the Commission's order in light of the specific circumstances of this case. This advertising campaign cost $8 million, ran for four years, and appeared in magazines, newspapers and on television throughout the country. The Commission found, and Sears does not dispute, that the campaign's central claim was false. Sears had no reasonable basis for making the claim, and the tests which Sears purportedly relied on showed, if anything, that the claim was false. Moreover, the Owner's Manual, which Sears furnished its customers after they purchased the Lady Kenmore, implicitly acknowledged the falsity of the claim and establishes that Sears

knew it was false at all times. Under these circumstances, Sears' advertising campaign demonstrates "blatant and utter disregard" for the law. *Standard Oil*, 577 F.2d at 662.[17] The Commission also considered petitioner's compliance record and concluded that it was "a wash." *Sears, Roebuck and Co.*, 95 F.T.C. 406, 517 and 518 n.10 (1980). We see no reason to find otherwise.

Sears' advertisements were no accident or "isolated instance." *Jay Norris*, 598 F.2d at 1250. Rather, they were part of an advertising strategy, with attendant slogans, adopted without regard to the actual performance of the advertised machines. As the Commission pointed out, the covered machines are major ticket items generally purchased infrequently by any particular person. For that reason, their profitability does not depend on repeat purchases as is the case with frequently purchased, low-cost items. A selling strategy based on this purchasing fact, *e.g.*, the making of false and unsubstantiated performance claims as to a major ticket item, would be effective for a considerable period of time, with great benefit to the merchant but at great cost to consumers. This selling strategy could readily be transferred to the marketing of other machines in the home appliance category.

▮ The prevention of "transfers" of unfair trade practices is a fundamental goal of the Commission's remedial work. Justice Brandeis, a draftsman of the 1914 legislation which created the Commission, made this point in *Federal Trade Comm'n v. Gratz*, 253 U.S. 421, 40 S.Ct. 572, 64 L.Ed. 993 (1920). Objecting to the Court's attempt to narrow the Commission's remedial authority, he expressed a view which has since become law:

17. Attempting to avoid this conclusion, Sears states that it halted the relevant promotions in 1975, two years before the Commission, on November 20, 1977, issued its complaint. This fact is not of any particular significance since the Commission's investigation began in 1975 and may well have been the cause of Sears' reducing its use of the false claims. *See Fedders*, 529 F.2d at 1403. Nor, we might add, do we understand the Sears catalogue, where the

advertisements continued in the 1976 and 1977 editions, to be an insignificant source of the company's business.

Moreover, Sears does not claim a good faith attempt to eliminate the misleading claims once they were "discovered" as did the company in *Standard Oil*, 577 F.2d at 663. Nor can it claim that the statements here were only "implied." *Id.*

The purpose of Congress [in creating the Commission] was to prevent any unfair method which may have been used by any concern in competition from becoming its general practice. It was only by stopping its use before it became general practice, that the apprehended effect of an unfair method . . . could be averted.

*Id.* at 441–42, 40 S.Ct. at 579–80 (dissenting opinion).[18]

It is not only pretermitting a "general practice" which is important here, however. The "transfer" to any other single major home appliance could well cause substantial damage to consumers prior to the time that the Commission could again investigate the facts and obtain the evidence necessary to prove that a similar violation had occurred. By that time, it would be too late to protect the large number of consumers who, in reliance on the truthfulness of the advertised claims, had purchased a major home appliance which they expected to perform the advertised work for many years. This danger is particularly acute where national brands, like Sears' major home appliances, are involved and the advertising campaigns are both widespread and intensive.

In addition, if we were to deny "transfer prevention" authority to the Commission under these circumstances, unscrupulous merchandisers (and we do not imply that Sears falls in that category) might be encouraged to transfer unlawful but successful advertising techniques from product to product, leaving the Commission the job of instituting separate proceedings to secure new orders for each unlawfully advertised product.[19] Because so drastic a limitation on the Commission's enforcement procedure would conflict with the Congressional intent described by Justice Brandeis, would consume enormous resources, and would afford no particular protection to lawful advertisements and little protection to con-

sumers, the Commission need not wait until a "transfer" occurs before issuing multi-product orders in cases like the one before us. It may issue and enforce such orders to avert an "apprehended effect." *Id.*

To prevent the false and unsubstantiated performance claims strategy from being used in connection with another major home appliance or from becoming Sears' general practice with respect to such appliances, the Commission deemed a broad order necessary. A judgment of this nature depends on detailed knowledge of the major home appliances business and its related advertising techniques. "[D]eceptive advertising cases necessarily require 'inference and pragmatic judgment.'" *Resort Car Rental System, Inc. v. FTC*, 518 F.2d 962, 963 (9th Cir.), *cert. denied sub nom. MacKenzie v. United States*, 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), *quoting FTC v. Colgate Palmolive Co.*, 380 U.S. at 385, 85 S.Ct. at 1042. This sort of knowledge of the commercial world and the ability to make the type of judgment required lie in the realm of the Commission's greatest expertise.

We note one other important fact. Unlike the orders upheld in *Colgate-Palmolive, Inc.* and *Jay Norris*, the order before us is not an all-products order. It is a limited order that applies only to 14 major ticket items. These 14 items constitute a small proportion of the total number of products sold by Sears.

■ In light of the flagrant and egregious nature of the violation found and the other circumstances present here, and giving the Commission's conclusions the required "great weight," *Simeon Management Corp. v. FTC*, 579 F.2d at 1145, we find no basis for substituting our judgment for the Commission's regarding the necessity for this multi-product order. We hold

---

**18.** The *Gratz* majority opinion was overruled in *FTC v. Brown Shoe Co.*, 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966).

**19.** While this proposition may appear to overstate the problem, we do not believe it does since any such merchant could sign a separate consent agreement covering each violation.

Then, when the Commission argued that the merchant's pattern of conduct supported a multi-product order, it would be met by the same argument that Sears makes here: that consent agreements do not constitute an admission or a finding of any violation.

that the multi-product order is reasonably related to the petitioner's conduct, that a multi-product order is appropriate, and that the inclusion of the "performance claims" provision [20] in that order is supported by the record before us and does not render the order overbroad.[21]

### B. The Third Element: Exclusion of Certain Evidence

Sears' third objection to the reasonableness of the order arises from the ALJ's exclusion of evidence relating to petitioner's advertising of major home appliances other than dishwashers. Sears contends that because the ALJ refused to receive or consider this evidence, the order's coverage of major home appliances is unreasonable. This argument is based on the proposition

that had the evidence been admitted, Sears could have shown that its advertising of the other covered products was lawful and that the strategic misrepresentations found as to dishwashers had not been transferred to the other products. Sears reasons that such a showing would have persuaded the ALJ that a multi-product order was unnecessary. Therefore, the company concludes, the order is unreasonable.

This argument misperceives the nature of the Commission's authority under *Mandel Brothers* to prevent acts "like and related" to the violation found. As described, this order is based on a violation found as to a single product and the Commission's concern that the unlawful strategic misrepresentation might be transferred to other

**20.** Although Sears does not challenge the performance claim concept *per se*, we note that the concept is a limited one. As a subset of the product characteristics category, performance claims provisions limit the orders to those representations that promise results. Characteristics such as color, components or size are not performance claims and are not covered by this order. Nor are such elements as price, the existence of warranties or the existence of certain endorsements. Of course, misrepresentation of characteristics other than performance claims, while not constituting a violation of the order, may nevertheless be unlawful under the Act.

Sears attacks the prohibition of false and unsubstantiated performance claims for major home appliances other than dishwashers as vague and uncertain. It professes puzzlement regarding a hypothetical humidifier advertisement stating that humidifying air helps reduce static electricity. Sears asks: Would such a claim be an implied performance claim requiring prior substantiation under the order even though the claimed effect represents a physical principle? We find Sears' puzzlement somewhat ingenuous but set out an answer to the hypothetical nevertheless. Because the advertisement attributes a causal capability to the machine, we think it is a performance claim. Because the claim is explicit, it is not an implied claim. Since the asserted capability is a physical principle, a sentence to the file reflecting the appropriate authority would be a reasonable discharge of the substantiation requirement. Sears poses a second hypothetical: whether a statement that a microwave oven has a timer programmable up to five hours is a "performance claim?" The answer is yes. In any event, "[c]oncern that hypothetical conduct might violate the order is an insufficient reason for modification." *Borden, Inc. v. FTC,*

674 F.2d 498 at n.50 (6th Cir. 1982) (citations omitted). Moreover, if Sears develops a genuine concern that "a proposed course of action would violate the present order, [it] can, by complying with the Commission's rules, [16 C.F.R. § 2.41(d) (1981 Ed.)] oblige the Commission to give it definitive advice as to whether the proposed action, if pursued, would constitute compliance with the order." *Colgate-Palmolive Co.,* 380 U.S. at 394, 85 S.Ct. at 1047.

Sears' vagueness and uncertainty contention with respect to the performance claims aspect of the order is generally unmeritorious. In addition, we doubt that it is properly before us. Although Sears alluded to this contention in its reply brief before the Commission, in its principal brief it complained of uncertainty or vagueness only with respect to the term "major home appliances" and to one aspect of the record keeping provision, subjects we discuss in subsection C, *infra.* Thus, Sears failed to comply with the requirements of 16 C.F.R. § 3.52. *See* Section III, *infra.*

**21.** Sears cites more than a dozen additional cases supposedly supporting its overbreadth challenge. Because these cases say nothing more or less than those we discuss, we need not address each case. However, Sears' reliance here on our *Standard Oil Co., supra,* decision is misplaced since that order covered *all* products numbering, for that company, in the thousands. In addition, certain advertisements promoting those products were required to be completely substantiated. Here, by contrast, the order covers only 14 types of machines, is limited to performance claims, and requires only reasonable substantiation of advertisements.

products. By its very definition, the *Mandel Brothers* rule is designed to prevent transfers that have not yet occurred, to prevent the use of an unlawful practice in connection with the sale of products *not previously sold* in that manner. *See Niresk Industries v. FTC*, 278 F.2d 337, 343 (7th Cir.), *cert. denied*, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 (1960) (*quoting FTC v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1953) for the proposition that Commission orders are designed to prevent "illegal practices in the future.").

■ For purposes of a "like and related" order, it may be assumed that there have been no violations with respect to the other products to be covered in the order.[22] Evidence that such is the case adds nothing to the proceedings and need not be admitted.[23] Moreover, even were such evidence admitted, it would be of little, if any, probative value. There are numerous reasons why a violator may have chosen to use a particular readily transferable unlawful advertising practice with respect to one product, but not others. The singling out of one machine for such treatment may constitute a business judgment that one such campaign at a time is enough. Other reasons may be the desire to minimize the risk of getting caught or to preserve the argument, if FTC proceedings are brought, that no more than a single product order is justified.

For these reasons, we hold that the ALJ's exclusion of evidence relating to Sears' ad-

vertising of other major home appliances was not unreasonable.[24]

## C. Record Keeping and "Major Home Appliances"

■ We cannot agree with Sears' argument that the record keeping provisions are ambiguous, uncertain and a "totally unwarranted burden." Basically, these provisions require Sears to maintain (1) material relied on in making claims which are subject to the order, and (2) certain contrary material in its possession, for a period of three years after it ceases making the claims in its advertising. The provisions enable the Commission to determine whether there was "prior substantiation" for Sears' claims. We hold that the order is not unduly burdensome in this regard and that the challenged terms are sufficiently clear and unambiguous. *See National Dynamics Corp. v. FTC*, 492 F.2d 1333, 1335–36 (2d Cir.), *cert. denied*, 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974).

Sears also objects to the category of "major home appliances" on the ground that there were other machines that might just as well have been included and some that might reasonably have been excluded. The Commission carefully considered all of Sears' arguments before defining the category. At Sears' request, it narrowed the proposed definition and eliminated the phrase "and any other product that falls within the category of major home appliances." Also at Sears' request, it clarified

**22.** An order prohibiting the repetition of "like and related" acts where such violations *had* occurred in the past, but were not a subject of the proceedings, might, under some circumstances, be contrary to the statutory procedure which requires unlawful acts to be charged and litigated. *See* 15 U.S.C. § 45(b). As a general matter, the statute does not contemplate the use of inculpatory or exculpatory evidence relating to like and related products in cases where no charge of wrongdoing is alleged in the complaint regarding those products, even though the products may, at the close of the proceedings be covered by the terms of the multi-product order. However, since we need not decide whether inculpatory evidence is admissible or under what circumstances it may be, we add that if in a particular proceeding

inculpatory evidence is adduced, exculpatory evidence could not properly be excluded.

**23.** Since we so conclude, it is unnecessary to consider separately Sears' argument that there is no substantial evidence in the record supporting entry of the order as to "major home appliances."

**24.** Nor would this evidence have been relevant to show functional dissimilarities among the various machines covered by "major home appliances." As we said, *ante* at 392, the issue is likely similarities in machine advertising. Proof that machines perform different functions in mechanically unrelated ways does not address this question.

its description of the specific products.[25] The Commission explained its designation of the 14 particular machines in part on the basis that to the extent Sears deems tests necessary these products are tested in a particular Sears laboratory, the one at which Sears tested the Lady Kenmore. Thus, Sears' compliance duties may have been simplified by the Commission's categorization. There may be other definitions of "major home appliances" that would also have been appropriate. However, any difference in judgment over the inclusion or exclusion of a particular appliance is not of great significance here. The record reflects that, while definitions of the term "major home appliances" may vary in minor respects, the term has a general connotation sufficiently close to that used by the Commission to make the Commission's categorization reasonable.

## III

## PROCESS THEORIES

Petitioner argues next that the order, as to products other than dishwashers, is arbitrary and capricious and constitutes an abuse of discretion under section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, and the Due Process clause of the fifth amendment.

These theories appear in the litigation for the first time on this appeal.[26] The question whether petitioner waived reliance on them here by not arguing them to the Commission in the first instance is therefore before us.

■ Exhaustion rules insure an adequate record, prevent surprise, and avoid the application of judicial resources to matters which might be resolvable at the agency level. In *Getty Oil Co. v. Andrus*, 607 F.2d 253 (9th Cir. 1979), we said:

A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented ..." *Unemployment Compensation Commission of Territory of Alaska v. Aragon*, 329 U.S. 143, 155 [67 S.Ct. 245, 251, 91 L.Ed. 136] (1946). Thus, absent exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative proceeding at the appropriate time.

*Id.* at 256 (citations omitted).[27] On the question whether exceptional circumstances exist here, Sears is silent.[28] We see none and therefore conclude that the section 706 and fifth amendment theories have been waived. *See generally Litton Industries, Inc. v. FTC*, 676 F.2d 364 (9th Cir. 1982). In any event, largely for the reasons explained in Part II, we see no merit to these arguments.[29]

25. The Commission's order as amended defines "major home appliances" as "air conditioning units (room or built-in), clothes washers, clothes dryers, disposers, dishwashers, trash compactors, refrigerators, refrigerator/freezers, freezers, ranges, stoves, ovens (including microwave ovens), humidifiers, and dehumidifiers."

26. To prosecute an appeal of an initial decision, the Commission's Rules of Practice require any party to state, "A specification of the questions intended to be urged;" 16 C.F.R. § 3.52(3) (1981), supported by "[t]he argument presenting clearly the points of fact and law relied upon in support of the position taken on each question ..." *Id.* § 3.52(4). Exhaustion is required despite the absence of an explicit exhaustion section in the Commission's organic statute. *See Cotherman v. FTC*, 417 F.2d 587, 594 (5th Cir. 1969).

27. We reaffirmed *Getty* in *Duncanson-Harrelson Co. v. Director, Etc.*, 644 F.2d 827, 832 (9th Cir. 1981).

28. In its two briefs, Sears does not address the exhaustion issue. The test requires a court to balance a party's interest in adequate redress for grievances against the agency's interest in "applying its expertise, correcting its own errors, making a proper record, enjoying appropriate independence of decision and maintaining an administrative process free from deliberate flouting...." *Montgomery v. Rumsfeld*, 572 F.2d 250, 253 (9th Cir. 1978).

29. This result works no injury on Sears. We have assessed vagueness and uncertainty objections in Section II, *supra*. There, we could not say the order was unreasonable, so it was unlikely we would have concluded it was "arbitrary, capricious or an abuse of discretion," the latter being a more limited standard of review

## IV

### FIRST AMENDMENT CONSIDERATIONS

The ground for Sears' final attack on the order is the line of recent Supreme Court cases extending certain protections of the first amendment to commercial speech.[30] From these decisions, Sears argues that the prior substantiation element of the Commission's order amounts to an unconstitutional prior restraint of protected speech or, that even if no prior restraint is found, the order's breadth and ambiguity impermissibly chill speech rights.

We consider these Constitutional arguments in the context of the particular advertising claims before us. The advertisements were of a straightforward, wholly commercial nature. Consumers were urged to purchase a Sears' product solely for reasons relating to the mechanical performance of the machine. The advertisements contained no material or comments having any relation directly or indirectly to any non-commercial first amendment interests. Our analysis is limited to advertisements of this nature.

Similar principles govern both aspects of Sears' argument. First amendment scrutiny of abridgements of commercial speech seeks to preserve the flow of truthful information from merchants to consumers. *Vir-*ginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Correlatively, false or deceptive commercial speech is entitled to no first amendment protection whatsoever. In *Central Hudson Gas v. Public Service Comm'n of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Court said:

> [T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it . . . .

*Id.* at 563, 100 S.Ct. at 2349, (citations omitted).

Here, we find that petitioner's first amendment claims fail. We concur in the Second Circuit's judgment that the Commission may require prior reasonable substantiation of product performance claims after finding violations of the Act, without offending the first amendment. *Jay Norris, Inc. v. FTC*, 598 F.2d at 1252.[31]

With respect to the "chilling" argument, petitioner does not dispute the facts upon which the Commission based its findings of flagrant violations of the Act repeated over a four year period. No serious argument could be advanced that the Com-

---

than that applied under the reasonableness concept.

**30.** *See e.g., Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 218 (9th Cir. 1979) (Duniway, J., concurring and dissenting).

**31.** *See generally FTC v. Standard Education Society*, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937); *E. F. Drew & Co. v. FTC*, 235 F.2d 735, 739–40 (2d Cir. 1956), *cert. denied*, 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.2d 323 (1957) *cited in Virginia Board*, 425 U.S. at 771 at n.24, 96 S.Ct. at 1830 n.24. Without citation, petitioner states, "[S]upreme Court decisions establish that prior restraint of truthful advertising statements offends the freedom of speech clause of the First Amendment."

The doctrinal question whether prior restraint analysis, *e.g., New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), is properly applicable to any commercial speech question remains open, *Friedman v. Rogers*, 440 U.S. at 10 & n.9, 99 S.Ct. at 894 & n.9; *Jay Norris, Inc. v. FTC*, 598 F.2d at 1252. *Standard Oil* is not necessarily contrary since we said there only that certain orders "[m]ay amount to a prior restraint on protected commercial speech," 577 F.2d at 662 (citation omitted) (emphasis added), and that the Commission should "exercise restraint in issuing such orders." *Id.* We see no reason to assume that the Commission failed to consider this admonition in issuing the order before us. Nor does *FTC v. Simeon Management*, 532 F.2d 708, 717 (9th Cir 1976) stand for a different view.

mission, by this order, is seeking to "keep the public ignorant" or otherwise limit the information available to the public. *Virginia Board*, 425 U.S. at 770, 96 S.Ct. at 1829. The Commission's findings represent a permissible judgment that petitioner's advertising campaign for the Lady Kenmore constitutes "communication more likely to deceive the public than to inform it . . . ." *Central Hudson Gas*, 447 U.S. at 563, 100 S.Ct. at 2350, (citations omitted). In particular, the Commission's findings that the violation found might be repeated and could be transferred readily to other major home appliances, provide adequate support for the order's application to those other appliances. Put differently, we do not think, given these findings, that the order is overbroad under the first amendment.

■ Nor does the order offend the vagueness doctrine of the first amendment. We agree with Justice Stewart who wrote that a "commercial advertiser generally knows the product or service . . . and is in a position to verify the accuracy of his factual representations before he disseminates them," *Virginia Board*, 425 U.S. at 777, 96 S.Ct. at 1833 (concurring opinion) and that therefore, there is little "danger that governmental regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression . . . ." *Id.* at 777, 96 S.Ct. at 1833; *see generally* L. Tribe, *American Constitutional Law* § 12.15 (1978). The order forbids false and unsubstantiated performance claims as to certain specific products. Given these limited proscriptions, and our judgment that Sears' other vagueness objections lack merit, we find no vagueness violation here.[32]

In summary, the order does not violate any of petitioner's constitutionally protected commercial speech rights.

*The Commission's order is enforced.*

32. Petitioner's reliance on *Beneficial Corp. v. FTC*, 542 F.2d 611, 618–19 (3d Cir. 1976) is erroneous. *Beneficial* involved an order preventing any use of a heavily advertised slogan. As such, the case fell within doctrine governing

J. BLAINE ANDERSON, Circuit Judge, dissenting:

Aside from any due process considerations that may be involved in refusing to admit and consider Sears' proffered evidence relating to petitioner's advertising of major home appliances *other* than dishwashers, I would remand with instructions to reopen the proceedings to permit Sears to present its evidence attempting to delimit the broad products order entered in this case.

Recognizing the broad discretion vested in the ALJ and the Commission in the reception and rejection of offered evidence, I am nevertheless compelled by ordinary everyday principles of fair play to the conclusion that this broad discretion was abused in this case. I am persuaded that the offered evidence was relevant to the issues and ought to have been received and considered. For this reason, I would not reach the other issues at this time.

On this narrow ground, I respectfully dissent.

Commission regulation of trade names. *See e.g., FTC v. Royal Milling Co.*, 288 U.S. 212, 217–18, 53 S.Ct. 335, 337, 77 L.Ed. 706 (1933); *Friedman v. Rogers*, 440 U.S. at n.11, 99 S.Ct. at n.11.